UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRISTINE ABBOTT,

                                      Plaintiff,

           v.                                              5:10-CV-277
                                                        (NPM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

_____

JENNIFER GALE SMITH, ESQ., for Plaintiff
SHEENA V. WILLIAMS-BAR, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable Neal P. McCurn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

    Plaintiff filed[1] an application for disability insurance benefits and Supplemental Security Income (SSI) on October 27, 2006, claiming disability since December 22, 2005. (Administrative Transcript ("T.") at 86-98).  Plaintiff's applications were denied initially on February 16, 2007. (T. 54-63), and she requested a hearing before an ALJ

---

[1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed" her application on September 28, 2006. (T. 44).  When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340.  There are various requirements for this written statement. *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

(T. 65-66).  The hearing, at which plaintiff testified, was conducted on March 17, 2009. (T. 8-38).

In a decision dated May 29, 2009, the ALJ found that plaintiff was not disabled. (T. 41-53).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 15, 2010.  (T. 1-5).

## II.    ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.    The ALJ did not properly consider the effect of plaintiff's non-exertional impairment. (Pl.'s Mem. at 6-8).

2.    The ALJ failed to properly consider the disability determination made by the plaintiff's treating physician. (Pl.'s Mem. at 9-12).

3.    The ALJ's opinion is not supported by substantial evidence. (Pl.'s Mem. at 13).

4.    The ALJ did not properly consider plaintiff's pain. (Pl.'s Mem. at 14).

5.    Reversal of the Commissioner's decision for calculation of benefits is required.[2] (Pl.'s Mem. at 15).

This court concludes for the reasons below that the ALJ's residual functional capacity (RFC) determination is not supported by substantial evidence, both from a physical and mental perspective.  The court also finds that the ALJ's credibility determination is not supported by substantial evidence.  However, the court disagrees that the case should be reversed for calculation of benefits, and instead, recommends a

---

[2] Plaintiff also argues, in the alternative, that the case should be remanded for further consideration. (Pl.'s Br. at 12).

2

remand for further consideration.

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 and in 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work

3

> experience . . . .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable

4

mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.* *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.  MEDICAL EVIDENCE

Many of plaintiff's medical records are from the period July 2005 through October 2006. (T. 149-306). Most of these records reflect plaintiff's emergency room visits while she lived in Virginia. (T. 155-208). On July 26, 2005, prior to plaintiff's disability onset date, the emergency room note states that plaintiff had abdominal cramps with vomiting, felt "light-headed," and fainted at the Kentucky Derby.[3] (T. 204). At that time, the "clinical impressions" were anxiety and tobacco abuse, but the doctor ordered a work-up for multiple sclerosis. (T. 205). Plaintiff visited the emergency room three times in October 2005 (T. 192-98, 187-91, 183-86), and three

---

[3] It is unclear how plaintiff could have been at the "Kentucky Derby" since the hospital was in Wythville, Virginia.

times in November 2005 (T. 177-82, 172-76, 149-54).

Plaintiff was admitted to the hospital on November 14, 2005, after she complained that she was vomiting blood on November 12 and November 13, 2005. (T. 149; 172-82).  On admission, her presentation "did not seem consistent" with the description of her symptoms, and a complete blood count was within normal limits. *Id.* She appeared to be suffering from gastroenteritis, but refused gastrointestinal testing. *Id.*  She was admitted to the hospital for observation and for intravenous fluids, because the doctor felt that plaintiff had " a number of social situations . . . which made fluid rehydration, on an outpatient basis, difficult . . . ." *Id.*

Dr. David Meyer, D.O. stated that plaintiff's anxiety was a "big factor in this illness." (T. 152).  He stated that plaintiff told him that she had moved from New York to Virginia to escape her abusive husband and a father, who sexually abused her. *Id.* She was worried that her husband was stalking her. *Id.*  Dr. Meyer stated that plaintiff's story "certainly had some dramatic elements which may be fabricated." *Id.* She stayed in the hospital until November 15, 2005. (T. 149).  Upon discharge, her dehydration was "resolved," her gastroenteritis was "resolved," however, she was diagnosed with "depression with features of anxiety." (T. 150).  Dr. Meyer continued her prescription for Lexapro, prescribed Xanax for anxiety, and Phenergan for nausea. *Id.*  Dr. Meyer also stated that a psychological consult was "in order." (T. 152).

On December 15, 2005, plaintiff returned to the emergency room, complaining that both her legs and her hands were numb. (T. 169).  Plaintiff told the admitting nurse that plaintiff had been trying to get to the University of Virginia Hospital to be

6

tested for Multiple Sclerosis.[4] (T. 169).  Plaintiff complained that she fell multiple

times in the 24 hours before she came to the emergency room, and she was suffering

from excruciating pain in the left side of her back. *Id.*  Plaintiff stated that she had

these symptoms "off and on [for] years." *Id*.  The nurse's assessment showed that

plaintiff was in no acute distress, was alert, her heart rate was normal, she was well

nourished, and was "independent" in her activities of daily living, although she was

ambulating with the assistance of a friend. (T. 169).

There are two separate emergency room reports dated December 28, 2005,

indicating that plaintiff went to the emergency room twice in one day. (T. 155-58,

159-68).  One report indicates that plaintiff was taken to a room at "18:55 [6:55

p.m.]." (T. 155).  She was complaining of dizziness with nausea and vomiting five

times in the preceding two days. *Id.*  Plaintiff told the nurse that it could be related to

multiple sclerosis that she had since she was "16." *Id.*  All plaintiff's vital signs were

normal, and she was discharged at "20:24 [8:24 p.m.]." (T. 156).  The second report

states that plaintiff went to the emergency room again at "23:20 [11:20 p.m.],"

complaining that she lost consciousness and fell, hitting her left hand and her head. (T.

159).  A nurse's note states that "mother says 'out X 10 min[utes].'" (T. 161).

Plaintiff's physical examination was essentially normal, a CT scan of her head showed

no skull fracture, and x-rays of her left shoulder and wrist were also normal. (T. 163-

65).  On January 29, 2006, plaintiff visited the emergency room complaining of pain

in her back and extremities, due to "MS." (T. 209).  She told the nurse that she had

---

[4] Plaintiff told the nurse that plaintiff had not had any tests yet, but she needed a "spinal tap + MRI @ UVA." (T. 169).

been diagnosed with MS seven years earlier. *Id.*  Plaintiff was given some medication and discharged home as "improved." (T. 209-10).

Between December 2, 2005 and May 16, 2006, plaintiff visited the Bland County Medical Clinic approximately eleven times. (T. 218-29, 243-71).  On May 10, 2006, plaintiff stated that she could be pregnant. (T. 223).  She stated that she had not missed her period, but had been experiencing pain in her left lower abdomen. (T. 223).  Plaintiff told the nurse that she had a history of five miscarriages. (T. 223).  A pregnancy test was negative at that time. (T. 224).  Among the listed diagnoses were depression and generalized anxiety disorder (GAD). (T. 220, 245, 248, 251).

Plaintiff attended counseling while she was in Virginia at Mount Rogers Community Counseling Services. (T. 298-306).  The transcript only contains plaintiff's initial assessment, dated December 9, 2005[5] and a document entitled "Other Activity Note" that simply lists dates that plaintiff may have attended counseling. (T. 298-305, 306).  The plaintiff's initial assessment indicated that plaintiff's level of impairment was "none" in meal preparation, housekeeping, taking medication, shopping, social skills, self care/hygiene, doing laundry, and transportation. (T. 301).  Her level of impairment was rated as "mild" in the areas of money management and ability to access resources. *Id.*

The initial assessment reported an Axis I[6] diagnosis of Generalized Anxiety

---

[5] This date is prior to plaintiff's alleged onset date of December 22, 2005.

[6] Psychological impairments are often assessed based on a "multiaxial system." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27 (4th Ed. Text Revision 2000) (DSM-IV-TR).  Axis I includes Clinical Disorders and other conditions that may be a focus of clinical attention. *Id.*  Axis II includes Personality Disorders and Mental Retardation. *Id.*

Disorder, recurrent Major Depressive Disorder, and Panic Attacks without

Agoraphobia. (T. 304).  The Axis II diagnosis reflected Borderline Personality

Disorder; Axis III was signs of MS: neurological problem; the Axis IV diagnosis was

"Problem with Primary Support Group." *Id.* The Axis V diagnosis stated "50 Current"

and "62 Past year."[7]  The examiner recommended counseling services for six to twelve

months. (T. 304).  There are no further substantive records from Mount Rogers.  The

last two entries on the "Other Activity Note" are dated July 28, 2006 and October 25,

2006, and indicate that plaintiff had moved, and the director approved closing the file.

(T. 306).

On March 21, 2006, plaintiff was evaluated at the UVA Multiple Sclerosis

Clinic. (T. 230-33).  Plaintiff had a brain MRI with normal results. (T. 238, 240).  Dr.

Virginia I. Simnad's  report stated that plaintiff was applying for disability for the

second time. (T. 235).  Dr. Simnad concluded that the diagnosis of MS could not be

confirmed. (T. 232).  On April 7, 2006, plaintiff was admitted to the hospital at UVA.

(T. 213-17).  The Discharge Summary, authored by Dr. Aman Savani, M.D.[8], states

that plaintiff fell and was subsequently unable to walk. (T. 213-17).  She was initially

brought to an emergency room, but then transferred to UVA for further care. (T. 213-

---

Axis III includes general physical medical conditions. *Id.*  Axis IV includes Psychosocial and
Environmental Problems, and Axis V is the Global Assessment of Functioning. *Id.*

[7] Axis V, the Global Assessment of Functioning Scale (GAF) is a 100 point scale, and 41-50
indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some
mild symptoms." DSM-IV-TR at 32-34.

[8] Dr. Aman Savani, M.D. is listed as the Discharge Resident, and Dr. Joel M. Turgman, M.D.
is listed as the Discharge Attending. (T. 213).

9

14).  During her stay at the hospital, an updated MRI showed no "active demyelinating lesions," and Dr. Savani referred to plaintiff's March 21, 2006 brain MRI as "essentially normal." (T. 215).  There was no evidence of multiple sclerosis, and the doctors concluded that her weakness "likely is functional."[9] *Id.*  Dr. Savani stated that plaintiff had a sexual abuse history and had Post Traumatic Stress Disorder (PTSD) as a result. (T. 215).  A psychiatric consultation was obtained, and the doctors determined that plaintiff "likely had a conversion disorder,[10] an underlying major disorder as well as PTSD." *Id.*  She was discharged with a wheelchair at her request, and arrangements were made to get plaintiff physical therapy at home.[11] *Id.*

Plaintiff was discharged, with a primary diagnosis of "probable conversion disorder, manifesting as bilateral lower extremity plegia and weakness." (T. 213).  The secondary diagnoses were Major Depressive Disorder; PTSD, Migraine Headaches, and Generalized Anxiety Disorder. *Id.*  Her discharge summary included orders to resume her "previous medications": Neurontin,[12] Xanax,[13] and Symbyax.[14] (T. 214-

---

[9] Dr. Savani noted that plaintiff "was also observed to be able to transfer herself to a wheelchair without assistance." (T. 215).

[10] A conversion disorder is a condition in which psychological stress is "converted" into physical symptoms, such as paralysis. DSM-IV-TR at 492-98.

[11] The doctors had planned to obtain in-patient rehabilitation, but plaintiff "did not want rehab and preferred to go home where her support network was." (T. 215).

[12] Neurontin (Gabapentin) is used to help control seizures and to relieve pain from shingles. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940.

[13] Xanax (Alprazolam) is used to treat anxiety and panic disorders. www.nlm.nih.gov/medlineplus/druginfo/medsa684001.html.

[14] Symbyax is a combination product, containing Fluoxetine and Olanzapine, used to treat depressive episodes associated with Bipolar Disorder in adults. www.rxlist.com/symbyax-drug.htm.

15).

Plaintiff moved back to New York State from Virginia in approximately June 2006.  The transcript contains records, dated June 16, 2006 to September 20, 2006 from Wise Woman OB/GYN in Syracuse, New York.[15] (T. 272-97).  Plaintiff stated that prior to her move back to New York, she was raped and became pregnant as a result. (T. 32, 272).

After plaintiff moved back to New York State, she underwent a consultative examination by Dr. James Naughton, D.O. (T. 311-14).  The examination occurred on December 5, 2006, and plaintiff was still pregnant at the time. (T. 311).  Dr. Naughton's musculoskeletal examination of plaintiff showed full range of motion generally; however, he found positive tender points at both elbows, the lateral region of both deltoids, both hips, the posterior superior iliac spine (PSIS) area, both thighs, the anterior ventral mid-thigh region, the ventral and dorsal portion of both wrists. (T. 313).  There were no motor or sensory deficits; no muscular atrophy; plaintiff's hand and finger dexterity were intact; her grip strength was 4 out of 5 bilaterally, and her ability to zip, button, and tie was fair. (T. 313).

Under the heading "Diagnoses," Dr. Naughton wrote: "[h]istory of chronic pain" and "[c]urrently at 32 weeks of pregnancy." *Id.*  The prognosis was "[p]ossibly guarded." *Id.*  At the end of his report, Dr. Naughton stated that "due to her pregnancy," the plaintiff may have to be restricted from activities requiring mild or

---

[15] The court notes that the 26 pages of Wise Woman OB/GYN records were labeled Exhibit 6F at the agency level. (T. 272-97).  However, some of the records contained in these 26 pages are plaintiff's prior medical records from Virginia. *See* (T. 289-96).

greater exertion". *Id*.  Dr. Naughton also stated that plaintiff had no limitations seeing, hearing, talking, sitting, or standing. *Id.*  She did have a moderate limitation walking, climbing stairs, pushing, pulling, or reaching. *Id.*

On January 2, 2007, plaintiff underwent a consultative psychiatric examination, administered by Jeanne A. Shapiro, Ph. D. (T. 315-18).  Dr. Shapiro stated that plaintiff's demeanor and responsiveness to questions was cooperative, and her manner of relating, social skills, and overall presentation were adequate. (T. 317).  Plaintiff's appearance was appropriate; her speech and language skills were adequate; her thought processes were coherent; her mood was calm, relaxed, comfortable, and talkative; her affect was of full range; she was oriented; her attention and concentration were intact; her memory skills were intact; and her intellectual functioning was in the average range. *Id.*

Dr. Shapiro found that, vocationally, the plaintiff was capable of understanding and following simple instructions and directions. (T. 318).  Dr. Shapiro also stated the "[b]arring any medical contraindications," the plaintiff appeared to be capable of performing simple and complex tasks with supervision and independently; appeared to be capable of maintaining concentration for tasks; regularly attend to a routine and maintain a schedule. *Id.*  Plaintiff also appeared to be able to learn new tasks and make appropriate decisions. *Id.*  Dr. Shapiro found that plaintiff appeared to "be able to relate to and interact appropriately with others *some of the time.*" *Id.* (emphasis added).  She appeared to be able to deal with "some stress," and the "[r]esults of the examination [were] consistent with allegations." (T. 318).

Under Axis I, Dr. Shapiro's diagnosis was PTSD and Adjustment Disorder[16] with mixed features. *Id.* There was no diagnosis under Axis II, and Axis III was an "Undiagnosed neurological problem" and migraines. *Id.* Dr. Shapiro recommended that plaintiff get treatment to deal with her psychiatric symptoms, and stated that her prognosis would be "better with treatment." *Id.* Dr. Shapiro hoped that "with appropriate intervention and support, [plaintiff] will find symptom relief and maximize her abilities." *Id.*

On February 15, 2007, a non-examining medical consultant[17] completed a Mental RFC Assessment, and a Psychiatric Review Technique[18] form. (T. 319-22, 330-43). In the Psychiatric Review Technique form, the consultant compared plaintiff's impairments to those listed in 20 C.F.R. Pt. 404, App. 1, §§ 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). The consultant found that plaintiff's impairments did not meet or equal the severity of listed impairments. (T. 330-43).

In the Mental RFC Assessment, the consultant found that plaintiff was "not significantly limited" in any understanding and memory categories; and was "not significantly limited" in all but one of the sustained concentration and persistence

---

[16] The essential feature of an Adjustment Disorder is a psychological response to an identifiable stressor that results in the development of clinically significant emotional or behavioral symptoms. DSM-IV-TR at 679-83.

[17] The consultant's name is listed at T. Harding. (T. 321, 330).

[18] The Psychiatric Review Technique form is used to compare the signs and symptoms of plaintiff's impairment to see if they rise to the severity of the impairments listed in Appendix 1 of the Social Security Regulations.

categories. (T. 319).  She was "moderately limited" in the ability to maintain attention and concentration for "extended" periods. (T. 319).  Finally, in the categories listed under Social Interaction and Adaptation, plaintiff was "not significantly limited" in all but one category. (T. 320).  She was "moderately limited" in her ability to accept instructions and respond appropriately to criticism from supervisors. *Id.*  The consultant concluded that the plaintiff's allegations regarding her mental limitations were "credible but not to the degree alleged," and that she could do "entry level work." (T. 321).

One of plaintiff's treating physicians for her physical impairments is Dr. Hom P. Neupane.  Plaintiff's initial rheumatology consultation with Dr. Neupane was on June 5, 2007. (T. 349-51).  Dr. Neupane stated that plaintiff complained of weakness and fatigue. (T. 349).  He stated that plaintiff had tender fibromyalgia points. (T. 350).  Her rheumatoid factor was negative, and he found plaintiff's MRI "unremarkable." *Id.*  He stated that plaintiff's symptoms were consistent with fibromyalgia and hypermobile joints, but she did not show signs of any inflammatory arthritis. (T. 351).  He suggested that plaintiff take Amytriptyline[19] at bedtime, and he "encouraged her to do some aerobic exercise or water therapy" and "to remain active." *Id.*

Her follow up appointment was on July 6, 2007. (T. 346-48).  In the July 6 report, Dr. Mamatha B. Gautam[20] stated that plaintiff was "unable to walk" and that

---

[19] This medication was to help plaintiff sleep. (T. 346).

[20] The report states that it was "read and edited" by Dr. Gautam, and that the report was "edited and electronically signed" by Dr. Neupane. (T. 348).  The report states that the case "was discussed with Dr. Neupane" and that he agreed with the recommendations made by Dr. Gautam. (T. 347).  Dr. Neupane added his approval note at the end of the report. *Id.*

she was "applying for disability." (T. 346).  Plaintiff told Dr. Gautam that her pain was on a level of about 8 or 9 out of 10.  Dr. Gautam found that plaintiff's neck was supple, and all movements of the neck appeared to be normal, although plaintiff complained of pain. (T. 346).  The doctor's assessment was that the plaintiff's hypermobile joints might indicate an underlying collagen disorder, "predisposing her to excess of fibromyalgia." (T. 347).  The amytriptyline was not working, and plaintiff was prescribed a new medication for sleep to prevent exacerbation of the fibromyalgia. (T. 347).  Plaintiff was taking Lexapro and Xanax for her psychiatric disorder. *Id.*

On July 17, 2007, Dr. Neupane completed an RFC evaluation that plaintiff's counsel submitted after the ALJ's hearing. (T. 401-402).  In Dr. Neupane's RFC, he found that plaintiff could lift five pounds, could walk "about" one to two blocks, could stand less than 20 minutes, and could only sit for one to two hours. (T. 401).  He found that she could not carry, push, pull, climb, or stoop. *Id.*  Dr. Neupane stated that plaintiff needed a psychiatric evaluation, muscle strengthening exercise, and low impact aerobic exercise or water therapy.[21] *Id.*  Plaintiff continued to see Dr. Neupane, and on January 28, 2008, he stated that although plaintiff had a full range of motion in both upper and lower extremities, she had generalized tenderness and more so on fibromyalgia tender points, consistent with "active fibromyalgia." (T. 391).

---

[21] This statement was in response to a direction to: "Identify any reasonable accommodations this client would require in order to participate in work activities." (T. 401).  It is unclear whether Dr. Neupane understood the statement, because this statement appears to be asking for "reasonable accommodations" in the nature of things that an employer could do in order for plaintiff to be able to perform work activities.  Nonetheless, it is a statement by plaintiff's doctor.

Plaintiff also attended Mercy of Northern New York Behavioral Health Services for her psychiatric impairment. (T. 362-390). The medical records indicate that she began attending in March of 2007. (T. 362-70, 378).  On June 7, 2007, plaintiff was evaluated by Dr. Lisa Hall. (T. 371-74).  Dr. Hall's evaluation indicated that plaintiff's symptoms were consistent with PTSD, and that her low mood, panic attacks, history of food restriction, and self injury appeared to be "side effects" of PTSD, rather than separate disorders. (T. 374).  Plaintiff did not have Major Depression, mania or hypermania. *Id.*  After her initial assessment by Dr. Hall, plaintiff continued to get treatment at Behavioral Health Services as evidenced by the progress notes included in the record. (T. 375-83).

After the ALJ hearing, plaintiff's counsel submitted a mental RFC evaluation completed by Dr. Hall on June 7, 2007. (T. 442-43).  In the RFC evaluation, Dr. Hall found that, although plaintiff had no impairment in understanding and remembering short, simple instructions, she had "Marked" impairment in her ability to understand and remember detailed instructions, carry out detailed instructions, and in the ability to make judgments on simple work-related decisions. (T. 442).  Dr. Hall stated that plaintiff could not carry out instructions that involved interacting with men, due to her PTSD. *Id.*  The PTSD would also impair her concentration. *Id.*  Her ability to deal with the public was extremely impaired, she had a marked impairment in interacting appropriately with supervisors, with co-workers, and dealing with work pressures in a usual work setting. (T. 443).  She was moderately impaired in her ability to respond adequately to changes in a routine work setting. *Id.*  The form also asked what

16

"supports this assessment." *Id.* Dr. Hall stated that the support for her statement was plaintiff's PTSD symptoms, her avoidance of men, her poor stress tolerance, her flashbacks, and her poor judgment. (T. 443).

After the hearing, counsel also submitted a determination by the Jefferson County Department of Social Services (DSS) dated July 18, 2007, which granted plaintiff's application for DSS disability benefits, beginning June 1, 2006. (T. 399-400). The diagnoses were fibromyalgia, Major Depression, General Anxiety Disorder, and Panic Disorder without Agoraphobia. (T. 400). It appears that the sections of Appendix 1 of the Social Security Regulations have been cited as the basis for plaintiff's diagnoses on the Jefferson County DSS report. *Id.*

## V.   TESTIMONY and NON-MEDICAL EVIDENCE

Born on January 6, 1984, plaintiff was 25 years old at the time of the ALJ's hearing. (T. 13). She testified that she was divorced and had a two-year-old child. (T. 13). Plaintiff earned a high school diploma and attended regular high school classes. (T. 14-15). Plaintiff's prior work consisted of a variety of jobs of short duration. (T. 16-20). These jobs included working at Dunkin' Donuts, a job that required standing throughout the day and doing "a little bit of everything." (T. 15). Plaintiff completed a Work History Report on November 8, 2006, in which she stated that her other jobs included cashier, "general employee," and secretary, however, she was unsure about the dates that she worked. (T. 128).

At the time of the hearing, plaintiff was working from 15 to 20 hours per week at the Maple View Family Restaurant as a cashier. (T. 19-20). Plaintiff stated that part

of her job at the restaurant involved making sure that the salad bar was filled. (T. 20).
The ALJ determined, based on the amount of income received by plaintiff at her
restaurant job, that she was not performing substantial gainful activity. (T. 21).
Plaintiff claimed that she was having trouble performing this work because she had a
hard time working with the public, due to her psychological issues, and a hard time
with the physical demands of the job, due to her constant pain. (T. 21, 24).

She testified that she had "extreme panic attacks," to the point where she could
not breath and would lose consciousness. (T. 22).  These anxiety attacks were
triggered by men or by being around large groups of people. (T. 22).  She testified that
occasionally, she was sent home from work when she had one of her panic attacks. (T.
23).  She testified that she had trouble maintaining focus because she was always
concerned about being cornered. (T. 23-24).  Plaintiff testified that she had taken[22]
Xanax, Lexapro, and Trazodone for her "emotional condition," but that they "never
took care of the problem." (T. 24).

Plaintiff was also taking Lyrica, hydrocodone, and one other medication for her
fibromyalgia. (T. 25).  Plaintiff testified that when she was taking the medication, she
could stand for approximately one hour without pain. (T. 25).  The pain was all
through her body, and she stated that she could feel it in her muscles, but the joint pain
was the worst. (T. 26).  Plaintiff stated that her pain was an "eight to a nine [on a scale
of 10] on a daily basis." *Id.*  Many times, plaintiff would have to lie down and prop
her legs up with a pillow for a few hours to alleviate the pain, but it would never

---

[22] At the time of the hearing, plaintiff was not taking any medications because her "medical
did get messed up." (T. 24).

completely go away. *Id.*

Plaintiff testified that, depending on the day, she could sit for two to three hours at a time before she had to get up or change position. (T. 26-27).  Normally, after plaintiff sat for a while, she would have to go lie down in bed. (T. 27).  She stated that she could walk for one half hour to forty five minutes before the pain started.  The ALJ questioned plaintiff about her restaurant job. (T. 27-28).  Plaintiff testified that she worked between four and five hours per day. (T. 27).  She stated that if the restaurant was not too busy, she would be allowed to sit down if she needed to, but sometimes, she was in such pain that the "tears [were] pushing to get through." *Id.* "[P]opping a pain pill "will help for a short amount of time." *Id.*

Plaintiff testified that all physical activities bothered her, and that she had been making her son, who then weighed 29 pounds, walk by himself for the last six months because she could no longer pick him up. (T. 28).  Plaintiff stated that her apartment was a disaster, and the only way that she could "manage" with a two-year-old was to have a few close friends or her "parents" come over to help clean and take care of her child. *Id*.  She testified that someone would come to her house "[a]nywhere from three to five times a week." *Id.*  She never took out the trash, vacuumed, or cleaned the bathroom by herself. (T. 29).  She stated that she could wash dishes, hang up clothes, and, keep the living room neat and free of the child's toys, although some days she "just [could not] do it." *Id.*  Most of the time, she had someone carry the laundry basket to the laundry facility because she could not do that by herself. *Id.*

Plaintiff stated that on good days, she could cook, but other times, she would

have to make dinners that she could cook in the microwave. *Id.*  She testified that a couple of times, she put the laundry basket on the ground, tried to pull it the best she could, and when she got to the stairs, she would "just bounce it down the stairs." *Id.* Plaintiff stated that she could take care of her personal hygiene, but had trouble brushing her hair. (T. 30).  She tried to exercise several times but it always resulted in an injury. *Id.*  She stated that a week before the hearing, she tried to "do a low impact exercise video," but pulled a muscle in her rib cage. *Id.*

Plaintiff testified that on a typical day, her son would get up at 9:00 or 10:00 a.m., and *when* she got up with him, she would go downstairs, give him a bowl of cereal, and change his diaper. *Id.*  She then would lie on the couch until noon, get up, give her son lunch, put her son down for his nap, and lie down for a nap herself. *Id.* When her son woke up from his nap, plaintiff would get up, try to wash the dishes, "pick up a little bit," then sit in a chair to either, read her son a book, or watch television. *Id.*  At dinner time, she would feed her son, give him a bath, and put him to bed by 8:00 p.m. (T. 31).  Plaintiff would then either lie down on the bed or sit on her rocker until she fell asleep. *Id.*  In order to bathe her son, plaintiff would put him in the tub and wash him quickly "while [she] stood there," and then she sat on the toilet lid while her son played in the bathtub. *Id.*

Plaintiff also testified regarding her PTSD.  She testified that her problem dealing with people, particularly men, prevents her from going out grocery shopping alone, and she never really went out at all. (T. 31).  She stated that she tried to go out to eat a couple of times, but had to excuse herself because she "couldn't handle being

there." *Id.*  Plaintiff stated that: "The most I get out is either doctors' appointments, work, or to go grocery shopping which I always take someone with me." *Id.*  Plaintiff testified that she had anxiety attacks, was in a lot of pain, and had a "lot of work-related accidents," including work injuries, and getting into arguments with employees and customers." (T. 32).  Occasionally, plaintiff would be so hysterical and upset at work, that a co-worker would had to follow her home to make sure she arrived safely. *Id.*  She testified that this occurs three to four times per week.  There were also situations in which the anxiety or the pain has gotten so bad that plaintiff "actually passed out." *Id.*

Plaintiff testified that she had "good reason" to dislike men because she was raped, and her child was the product of that assault. *Id.*  This situation made it very difficult for her and sometimes, she would have a friend take her son because it was "just too much" for plaintiff. (T. 33).  She suffered from flashbacks and nightmares. (T. 34).  Plaintiff stated that the restaurant where she worked was a "truck stop," and that there were a lot of truckers who behaved badly. *Id.*  Plaintiff stated that she used to "cut herself," but she was "doing a lot better with that." (T. 33).  Although plaintiff testified that she had trouble concentrating at work, the only trouble with her supervisor was a "personality thing," because she did not understand plaintiff's situation and wanted plaintiff to work more hours that she was able to work. (T. 33-34).  Plaintiff stated that, between her fibromyalgia and her psychological problems, she would not be able to work more than she was currently working "even with the medicine." (T. 35).

The ALJ asked plaintiff about an episode of paralysis that left plaintiff unable to walk when she lived in Virginia in 2006. (T. 36).  Plaintiff stated that after that one episode in 2006, she had "small episodes" that lasted an hour or two, but nothing that would require her to use a wheelchair as she did in Virginia. *Id.*  She stated that she got "numbness on and off," and that Dr. Neupane told plaintiff that the fibromyalgia could cause her to lose feeling in her legs. *Id.*  Plaintiff stated that "if I can manage to win this case, I am going to discontinue working," because it was too much for her, but she had been told that if she did not work, she would lose her son. (T. 19, 37).

## VI.   ALJ'S DECISION

Although plaintiff was working at the time of the ALJ's hearing, the ALJ determined that plaintiff's work did not constitute substantial gainful activity (SGA) under the regulations and, therefore, did not deny plaintiff's claim based on her work status.  The ALJ then determined that plaintiff suffers from PTSD, a personality disorder, and fibromyalgia, all of which, he considered "severe" impairments under the regulations. (T. 46).  The ALJ determined that the severity of plaintiff's impairments did not rise to the level of listed impairments.  (T. 47-48).  With respect to plaintiff's PTSD, the ALJ compared plaintiff's impairment with the signs and symptoms listed in 20 C.F.R. Part 404, Subpart P, App. 1, §§ 12.04 (affective disorders) and 12.08 (anxiety-related disorders). (T. 47).  The ALJ concluded that plaintiff did not have sufficiently "marked" restrictions, nor did she have "repeated episodes of decompensation." (T. 48).

The ALJ found that plaintiff had no past relevant work, but still had the RFC to

perform a full range of entry-level light work. (T. 48-49).  Although the ALJ

acknowledged that plaintiff's physical impairment caused her pain, he found that her

statements regarding the intensity, persistence, and limiting affects of those symptoms,

were not credible to the extent that they were inconsistent with an ability to do light

work. (T. 49).  The ALJ found that the "preponderance of the evidence points to an

individual who tends to exaggerate her symptoms. (T. 50).  He rejected Dr. Neupane's

RFC evaluation, indicating that plaintiff could only lift and/or carry and push and/or

pull five pounds, walk about one to two blocks, stand less than twenty minutes, and sit

for one to two hours. (T. 51).

Instead, the ALJ relied upon Dr. Naughton's report to find that plaintiff could

perform light work and upon Dr. Shapiro's report to find that plaintiff could perform

entry-level work. (T. 50-51).  The ALJ found that plaintiff's psychological impairment

had no effect upon the occupational base of unskilled light work. (T. 53).  The ALJ

also rejected an alleged opinion by Dr. Lisa Hall,[23] stating that plaintiff had "marked"

limitations due to her PTSD. (T. 51).  He rejected this opinion, in part, because it was

not submitted into evidence. *Id.*  The ALJ concluded that plaintiff was not disabled

under the Act. (T. 53).

## VII.   ANALYSIS

### 1.   Residual Functional Capacity

In rendering a residual functional capacity (RFC) determination, the ALJ must

consider objective medical facts, diagnoses and medical opinions based on such facts,

---

[23] In his decision, the ALJ did not acknowledge that such an opinion existed. (T. 51).

as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

In this case plaintiff argues both that the ALJ did not properly consider the limitations caused by her physical impairment, as well as the additional limitations caused by her psychological or "nonexertional" impairment in determining that plaintiff could perform a full range of entry-level light work.[24] This court agrees.

## A.   Physical Impairments

The ALJ found that plaintiff had the physical capability to perform "light work." (T. 48-49).  Light work involves lifting no more than 20 pounds at a time, with

_____

[24] Although the court has analyzed plaintiff's physical and mental impairments separately for purposes of the RFC analysis, it is clear that the ALJ must consider impairments in combination to determine their effect on plaintiff's ability to work. *Martone*, 70 F. Supp. 2d at 153 (citing 20 C.F.R. §§ 404.1523, 416.923).

frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567 (b).  When the weight lifted is "very little," a job is still in the light work category when it requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*  The regulations also state that in order for an individual to be considered capable of performing a "full or wide range" of light work, she must "have the ability to do substantially all of these activities." *Id.*  Finally, if the individual can perform light work, there is a presumption that he or she can do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. *Id.*

The ALJ relied upon Dr. Naughton's December 5, 2006 consultative report to determine that plaintiff could perform light work. (T. 51).  The ALJ rejected treating physician, Dr. Neupane's RFC evaluation, dated July 17, 2007, submitted by counsel after the hearing. (T. 51, 401).  While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

The ALJ rejected Dr. Neupane's assessment because the "limitations identified,

25

particularly with respect to sitting, standing and walking do not specify if they relate to the claimant's ability to do these activities at one time, over a period of time or in an entire work day." (T. 51).  However, Dr. Naughton's report suffers from the same deficiency.  Although Dr. Naughton stated that plaintiff would have no limitation seeing, hearing, talking, sitting, or standing, and a "moderate limitation" walking, climbing stairs, pushing, pulling, and reaching, the doctor never estimated the amount of weight that plaintiff could lift.  Light work requires that plaintiff lift up to 20 pounds occasionally and up to 10 pounds frequently. 20 C.F.R. § 404.1567 (b).  Dr. Naughton also never states what he believes a "moderate" limitation to be or how that affects the plaintiff's ability to perform work for any period of time.

In *Bennett v. Astrue*, Chief Judge Mordue found that the ALJ's reliance upon a medical report in which the doctor "simply" stated that plaintiff had "moderate limitations," was insufficient to provide substantial evidence for the ALJ's RFC analysis. *Bennett v. Astrue*, 6:07-CV-780, 2010 WL 3909530, *7-8 (N.D.N.Y. Sept. 30, 2010).  Thus, the ALJ improperly rejected Dr. Neupane's report and made the determination that plaintiff could physically perform light work, because there is nothing in the record that supports the plaintiff's ability to lift up to 20 pounds occasionally and lift and carry up to 10 pounds frequently, and there is no indication what Dr. Naughton's "moderate" limitations entail.

The ALJ also rejects Dr. Neupane's assessment as "inconsistent" because he encourages plaintiff to "stay active," participate in muscle strengthening activities, and participate in low impact aerobic exercise "and" aqua therapy. (T. 51).  While Dr.

26

Neupane's RFC is very restrictive, there is little else in the record to allow the ALJ to make a specific physical RFC evaluation. Additionally, although Dr. Neupane did recommend that plaintiff engage in these activities,[25] he actually recommended aerobic exercise "*or*" aqua therapy. (T. 401) (emphasis added). Plaintiff testified at the hearing that when she attempted to do some exercise, it resulted in an injury that prevented her from continuing. (T. 30). Plaintiff also testified that she could no longer pick up her son, who then weighed 29 pounds, and that she had not been able to do so for approximately six months. (T. 28).

The court would also point out that Dr. Naughton's consultative report was written when plaintiff was pregnant, and before the diagnosis of fibromyalgia was confirmed. Dr. Naughton's comment that, due to plaintiff's pregnancy, she "may need to be restricted from activities requiring mild or greater exertion," does not provide substantial evidence for the ALJ's assumption that after the birth of plaintiff's baby, she would be able to perform light work, given the lack of any evidence other than Dr. Neupane's 2007 more restrictive assessment.

Dr. Neupane's opinion was used by the Jefferson County DSS in determining that plaintiff was disabled as of June 1, 2006. (T. 399-401). The ALJ rejected this finding because it was based upon Dr. Neupane's RFC, which the ALJ found "inconsistent" with Dr. Neupane's medical records. (T. 51). The court is well aware that other agencies' determinations that plaintiff is disabled are not binding on the

---

[25] The court must also point out that although the ALJ states that Dr. Neupane recommended low impact aerobic exercise "and" aqua therapy, Dr. Neupane's report actually says "or aqua therapy." (T. 401).

27

Commissioner,[26] however, the Second Circuit has held that they are entitled to some weight and should be considered. *See Quimby v. Comm'r of Soc. Sec.*, 1:09-CV-20, 2010 WL 2425904, at *13-14 (D. Vt. April 13, 2010) (citing *Steiberger v. Sullivan*, 738 F. Supp. 716, 744 (S.D.N.Y. 1990)).

In this case, although the ALJ rejected the DSS finding, giving it absolutely no weight,[27] the rejection was not based upon substantial evidence.  Dr. Neupane was the doctor who diagnosed plaintiff's fibromyalgia, and it is unclear how his RFC is "inconsistent" with his medical records.  In fact, on July 6, 2007, Dr. Gautam's/ Neupane's report indicated that plaintiff also had hypermobile joints, which could indicate an underlying collagen disorder,  "predisposing her to excess of fibromyalgia."  Given that the only other physical RFC was done when plaintiff's fibromyalgia was not diagnosed, there is no other basis in the record for determining that plaintiff could perform light work, particularly when there is no indication, even in the RFC upon which the ALJ relied, that plaintiff can perform the lifting capabilities required for the light exertional category.

The ALJ also stated that Dr. Neupane's limitations were inconsistent with plaintiff's daily activities, her ability to care for her young child, and her ability to work. (T. 51)  The ALJ seemed to take issue with plaintiff's testimony that she "had to work because the Department of Social Services threatened to take her child if she

_____

[26] 40 C.F.R. § 404.1504.

[27] The ALJ simply stated that he did not "accept the Jefferson County Department of Social Services conclusion that the claimant was disabled . . . . [A] determination by another agency is not necessarily persuasive." (T. 51).

didn't." *Id.*  Plaintiff testified, however, that she was in "excruciating pain" at work; and this court concludes that plaintiff's attempts to work because she feared that Social Services was going to take her child otherwise is not at odds with her claim that the work was too much for her.  Plaintiff also testified that she has other people come to help her to take care of her son, "anywhere from three to five times a week." (T. 28).  Thus, the ALJ's reasons for determining that plaintiff can perform the physical requirements for light work are not supported by substantial evidence.

### B.  Mental Impairment

In addition to physical impairments, the plaintiff suffers from PTSD.  In determining that plaintiff's psychological impairments would not prevent plaintiff from performing "entry level" work, the ALJ stated that, although counsel stated that Dr. Hall found plaintiff to have "marked limitations," that opinion was "not submitted into evidence." (T. 51).  The ALJ then stated that even if "such opinion exists, I grant little weight to it as it is inconsistent with the longitudinal objective record." *Id.*  The ALJ's final reason was that the record demonstrated only one visit to Dr. Hall on June 7, 2007 at which time, she diagnosed PTSD. *Id.*  The ALJ's final comment was that "[n]o functional limitations were identified by Dr. Hall *at that time* and there are [sic] evidence of further visits to her." *Id.* (emphasis added).

While it is true that counsel did not submit Dr. Hall's mental RFC in time for the ALJ's decision, the report was submitted to the Appeals Council in addition to other evidence, which the Appeals Council found did not provide a basis for changing the ALJ's decision. (T. 2).  The Appeals Council rejected Dr. Hall's report because

"there was no psychological testing accompanying this form, nor any credible supporting documentation." *Id.*  However, a review of Dr. Hall's mental RFC shows that it is dated June 7, 2007. (T. 442-43).  This is the same date that she examined plaintiff, making the ALJ's statement that "no functional limitations were identified *at that time*," an incorrect statement.  The RFC report clearly accompanied the doctor's narrative report that already appeared in the record.  Thus, it is unclear what "psychological testing" the Appeals Council believed was necessary to "accompany" the form, and it is unclear whether the Appeals Council noticed that the narrative report, accompanying the form was already in the record.  The court does note that Dr. Hall's narrative report also contains an assessment under Axis V, Global Assessment of Functioning. (T. 374).  According to Dr. Hall, plaintiff's GAF score was "50," indicating "serious symptoms," including "any serious impairment in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers)."[28] DSM-IV-TR at 32-34.  It appears that the RFC was somehow omitted from the record.  It is also difficult to determine how the ALJ could have rejected a report as "inconsistent" without seeing it.

Finally, although there were no additional visits to Dr. Hall, herself, Dr. Hall's reports are part of the Mercy Behavioral Health Services reports. (T. 362-83).  Dr. Hall was the psychiatrist, but plaintiff also saw various clinicians at Mercy Behavioral Health.  It appears that Dr. Hall was part of a treatment team.  Dr. Hall's

---

[28] The court notes that this is consistent with the GAF scores from the December 2005 Mount Rogers Community Counseling Services report. (T. 304).  The examiner scored plaintiff "50 current" and "62 past year." *Id.*

June 7, 2007 progress note[29] states that she met with plaintiff to make an evaluation, and that her assessment form was included in the "assessment section." (T. 375). The doctor's narrative report also appears in the record. (T. 371-74). Dr. Hall's June 7, 2007 progress note also stated that she completed an "employability form" and gave it to the therapist. *Id.* Dr. Hall then referred plaintiff to "med clinic." *Id.* The next entry in the progress notes is dated June 14, 2007, refers to Dr. Hall's PTSD diagnosis, and is written by Sherry Lalonde, the clinical therapist.[30] (T. 375). Although it does not appear that plaintiff was examined multiple times by Dr. Hall, the doctor was part of the same group that saw plaintiff for several months.

The ALJ's rejection of Dr. Hall's opinion was based on incomplete evidence and an incorrect assumption. The omitted report was provided to the Appeals Council, together with other medical evidence. (T. 442-43). The Appeals Council compounded the error by stating that there was no evidence to support the limitations listed on the form. The report does, in fact, provide "marked restrictions" in three areas of understanding and carrying out instructions. (T. 442). The report also states that plaintiff has "marked limitations" in three areas involving interaction with others. (T. 443).

The ALJ instead relied upon consulting psychologist, Dr. Shapiro's report. (T. 51-52). The ALJ's rejection of Dr. Hall's report was, incorrect, because Dr. Hall was part of a treatment team, which examined plaintiff multiple times, but was also

---

[29] This was included in the record before the ALJ. (T. 375).

[30] Although Sherry Lalonde's signature and title are difficult to read on the progress notes, the next page lists her name clearly, together with her title "Clinical Therapist." (T. 376).

31

inconsistent with his acceptance of the opinion of Dr. Shapiro, who only saw plaintiff once. The ALJ also cites the February 15, 2007 opinion of the non-examining "medical consultant", who found only a moderate limitation in plaintiff's ability to maintain attention and concentration for extended periods and a moderate limitation in plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors. (T. 319-20). Although the ALJ states that this non-examining consultant was reviewing the record,[31] he or she did not have the benefit of the Mercy Behavioral Services records, which begin in March of 2007. Thus, the ALJ's determination of plaintiff's RFC is not supported by substantial evidence.

## 2.   **Pain and Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical

---

[31] (T. 51-52).

evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

In this case, the ALJ stated that the preponderance of the evidence points to an individual who "tends to exaggerate her complaints", and that "[t]his does not enhance her credibility." (T. 50). In making this determination, the ALJ pointed to various items in the record that the ALJ believed were inconsistent with plaintiff's alleged level of pain. *Id.* While the record generally supports the ALJ's statements,[32] the ALJ

---

[32] The record reflects various times when plaintiff recounted inconsistent histories to medical personnel. As stated above, when she lived in Virginia, she visited the emergency room on multiple

also found that reading books "is inconsistent with an inability to sit for any length of time and difficulty with concentration and focusing." (T. 50). Plaintiff testified that she could probably sit for two to three hours at one time. (T. 27). Although that is not an extended period of time, and may be insufficient for most sedentary or light work, it is certainly enough time to read a portion of a book or magazine.

It is unclear where the ALJ determined that plaintiff's reading was inconsistent with an inability to sit for long periods of time. In a "function report," completed by the plaintiff on November 8, 2006, plaintiff listed one of her hobbies as "reading." (T. 121). She never stated how long she read or what she was reading. The only other time that reading is mentioned in the record is during plaintiff's testimony, when she stated that she occasionally "reads" books to her son or watches television. (T. 30). Again, plaintiff never stated how long she could perform this activity, and clearly, reading to a two-year-old does not necessarily involve a great deal of concentration. Thus, although plaintiff has made some inconsistent statements in the record, and may exaggerate her complaints, the ALJ has used some inappropriate bases for rejecting her credibility. Upon remand, the ALJ should also review the credibility determination.

---

occasions. One medical provider stated that there was a "dramatic element" to her story of spousal and parental abuse that could be fabricated. (T. 151). However, that medical provider also recommended a psychological consultation was "in order." (T. 152). She told emergency room nurses that she had been diagnosed with "MS," however, the 2001 "work up" for MS was "lost." (T. 236). Plaintiff also stated on September 20, 2006, that her only sexual contact was when she was raped on May 10, 2006, however, on May 10, 2006, she went to the hospital and told the medical providers that she had five miscarriages and thought she might be pregnant because she had abdominal pain. (T. 233, 272). She was not pregnant at the time, and she never mentioned the alleged sexual assault that resulted in her actual pregnancy. (T. 233).

### 3.     Remand or Reversal

This court has found that the ALJ's decision is not supported by substantial evidence and must now determine whether remand for additional proceedings or reversal with a remand for calculation of benefits is appropriate.  Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Id.*

In this case, although this court finds that the ALJ's opinion is not supported by substantial evidence, the court also find that there is insufficient evidence to find the plaintiff disabled under the Social Security Act.  Thus, remand for calculation of benefits would not be appropriate, and the court will recommend remand for further proceedings consistent with this report.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper determination of plaintiff's residual functional capacity to perform light work and a proper consideration of plaintiff's credibility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 14, 2010

Hon. Andrew T. Baxter
U.S. Magistrate Judge